## Black v. Commonwealth.

(Decided September 29, 1916.)

## Appeal from Fayette Circuit Court.

1.  Statutes—Construction.—A statute should not be extended beyond the fair and reasonable meaning of its terms, because of some supposed policy of the law or because the legislature did not use proper words to express its meaning.

2.  Statutes—Construction—Doctrine of Ejusdem Generis.—The meaning of a word used in a statute must be construed in connection with the words with which it is associated, and by the doctrine of ejusdem generis, where general words follow the enumeration of particular persons or things or particular classes of persons or things, the general words will be construed as meaning persons or things of like kind or class with those enumerated.

3.  Burglary—Explosives—Nitro-Glycerin—Section 1159, Kentucky Statutes.—Nitro-glycerin is not included in the meaning of section 1159, Kentucky Statutes, which makes it a felony for any person to "have or keep in his possession any tools, implements, or other things used by burglars for housebreaking, etc.," hence an indictment charging one with having such explosive in his possession does not state a public offense under the statute.

R. E. LEE MURPHY for appellant.

M. M. LOGAN, Attorney General, and CHARLES H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The grand jury of Fayette county found and returned in the circuit court of that county against the appellant, James Black, the following indictment:

"The grand jury of Fayette county, in the name and by the authority of the Commonwealth of Kentucky, accuse James Black of the crime of having possession of burglar's tools, committed as follows, viz.: That said James Black, on the 29th day of January, 1916, in the county aforesaid and before the finding of this indictment, unlawfully and feloniously did have in his possession a bottle of explosive substance, the exact name of the same is unknown to the grand jurors, used by burglars for housebreaking, forcing doors, windows, locks, and buildings and other places where goods, wares, merchandise, and money are kept; said James Black then and there intending to use said explosive

substance aforesaid burglariously, against the peace and
dignity of the Commonwealth of Kentucky.''

Appellant's trial under the above indictment re-
sulted in a verdict and judgment finding him guilty and
fixing his punishment at confinement in the penitentiary
not less than two nor more than four years. He was
refused a new trial, hence this appeal. He urges as
grounds for a reversal of the judgment of conviction:
(1) Error of the trial court in overruling his demurrer
to the indictment; (2) Error of that court in refusing to
grant the peremptory instruction directing his acquittal,
asked by him at the conclusion of the Commonwealth's
evidence; (3) That there was no evidence to support the
verdict.

The facts established by the Commonwealth's evi-
dence were, in brief, as follows: Appellant, who is a
resident of Ludlow, Kentucky, was arrested January
29, 1916, on Whitney street, in Lexington, at the home
of one J. W. Rice, who was shortly thereafter himself
arrested for a burglary committed on the night of Jan-
uary 27th. Rice was tried for and convicted of this
crime but a day or two before appellant's trial. On
January 29th, two police officers went to Rice's home
on the hunt for evidence to connect him with the bur-
glary referred to and there saw Rice's wife and appel-
lant and found in the house a bottle containing a sub-
stance they believed to be an explosive, which Mrs. Rice
informed them belonged to her husband. They took
charge of this bottle and following appellant's arrest
found upon searching his person, a bottle containing a
very small, barely perpectible, quantity of a substance
identical in appearance with that in the other bottle
found at Rice's house. After committing appellant to
jail the police officers, or one of them, delivered the two
bottles to a Lexington chemist for analysis, who testi-
fied that he found the contents of both bottles to be a
powerful explosive known as nitro-glycerin. Neither
the two bottles nor their contents were produced at ap-
pellant's trial, both, as testified by the chemist, having
been destroyed by him because of his belief that their
highly explosive character made it dangerous to keep
or handle them. In addition to the above facts, it was
shown by the Commonwealth's evidence that appellant
was a friend of Rice and an occasional visitor at his
house. None of the evidence of the Commonwealth con-
nected appellant with the burglary committed by Rice

or conduced to prove that nitro-glycerin was used by the latter in committing the burglary.

Appellant did not testify himself, but introduced J. W. Rice as a witness in his behalf, who admitted that the bottle of nitro-glycerin found by the police officers at his house had been left there by him and that he had also left there another small bottle from which he had emptied nitro-glycerin into the one found in his house, and supposed the entire contents of the small bottle had been poured into the other. The small bottle from which he had attempted to pour the contents was, as he stated, the one found upon the person of appellant and had been furnished appellant by him for obtaining Sloan's liniment, to be used by appellant for rheumatism, with which he was so afflicted in his legs as to compel the previous use of crutches in walking. Rice further testified that appellant's arrest was affected while he had the small bottle in his possession, before he had an opportunity to obtain the Sloan's liniment, and that appellant was in no way connected with him in the commission of the burglary for which the latter was convicted.

The first question to be determined is whether the facts stated in the indictment constitute a public offense, and this question was properly raised by the appellant's demurrer to the indictment. Criminal Code, section 165, subsection 4. The proper solution of this question depends upon the construction to be given the language of section 1159, Kentucky Statutes, upon which the indictment is based. That section provides:

"Every person guilty of robbery or burglary shall be confined in the penitentiary not less than two nor more than ten years. If any person shall have or keep in his possession any tools, implements, or other things used by burglars for housebreaking, forcing doors, windows, locks, or buildings, or other places where goods, wares, or merchandise or money is kept, with the intention of using said tools or implements burglariously, shall be confined in the penitentiary not less than two nor more than ten years."

It will be observed that the indictment follows the language of the statute; but is the explosive found on the person of appellant a tool, implement or other thing in the meaning of the statute, the possession or use of which for housebreaking, etc., is denounced by its terms? In construing a statute the rule generally to be observed

is that whatever is necessarily or plainly implied in a statute is as much a part of it as that which is expressed, but a statute should not be extended beyond the fair and reasonable meaning of its terms because of some supposed policy of the law or because the legislature did not use proper words to express its meaning. This rule of construction is especially applicable to statutes defining crimes and regulating their punishment. A further rule of construction is that the meaning of a word used in a statute must be construed in connection with the words with which it is associated, and out of this rule arises the doctrine of *ejusdem generis,* which is thus well stated in 36 Cyc., 1119:

"By the rule of construction known as '*ejusdem generis,*' where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The particular words are presumed to describe certain species and the general words to be used for the purpose of including other species of the same genus. The rule is based on the obvious reason that if the legislature had intended the general words to be used in their unrestricted sense they would have made no mention of the particular classes. The words 'other' or 'any other' following an enumeration of particular classes are therefore to be read as 'other such like,' and to include only others of like kind or character. The doctrine of *ejusdem generis,* however, is only a rule of construction, to be applied as an aid in ascertaining the legislative intent, and does not control where it clearly appears from the statute as a whole that no such limitation was intended. Nor does the doctrine apply where the specific words of a statute signify subjects greatly different from one another; nor where the specific words embrace all objects of their class, so that the general words must bear a different meaning from the specific words or be meaningless."

Application here of the doctrine of *ejusdem generis* will not reasonably allow to the words "or other things used by burglars for housebreaking," etc., appearing in the statute, the meaning that they include nitro-glycerin, which, though it may be used for the purposes denounced by the statute, is more commonly used for other and legitimate purposes, such as the removal of obstructions in the way of erecting buildings, construct-

ing railroads and making other public improvements. It could with as much propriety be claimed that a flask of gunpowder or package of gun shells found upon one's person would constitute the offense defined by the statute, as the powder or shells might be used in housebreaking and for that reason would by implication come within the meaning of the words "or other things used by burglars for housebreaking," contained in the statute. The strained construction of the words mentioned contended for by counsel for the Commonwealth cannot in fairness or reason be accepted. Things designated as tools and implements, as in the statute, and the possession of which, with a burglarious intent, is therein denounced, are such tangible, metallic or other physical objects or instruments as would be available for use and are commonly used in committing burglary. Consequently, the words "or other things used by burglars for housebreaking," etc., must be held to embrace and mean only objects or things of the same general nature or class as those designated, i. e., of like kind or character. The mere fact that a substance such as powder, or a liquid explosive, such as nitro-glycerin, may be used in housebreaking, cannot entitle them to be placed in a class with such things as are designated in the statute as tools and implements.

To illustrate our meaning, section 1242, Kentucky Statutes, among other things, declares that "if any person shall in a sudden affray, or in sudden heat and passion, without previous malice, and not in self defense, * * * cut, thrust or stab any other person with a knife, dirk, sword or other deadly weapon, without killing such person, he shall be fined not less than fifty nor more than five hundred dollars, or confined in the jail not less than six months nor more than one year, or both, in the discretion of a jury." In construing this section we held that the word "or other deadly weapon" therein used, does not include a wooden club with which a wound was inflicted by striking, although such club was a deadly weapon. Erwin v. Commonwealth, 96 Ky. 422.

In Commonwealth v. Kammerer, 11 Ky. L. Rep. 777, the defendant was indicted under a statute which made it a felony for any one to set up, carry on or conduct a keno bank, faro bank or other machine or contrivance used in betting, whereby money or other things may be won or lost. On the trial of the case in the circuit court

it was developed that the game engaged in was commonly known as craps or oontz, which is played with two ordinary dice on a table. The trial court, being of the opinion that the facts developed by the evidence did not constitute an offense within the meaning of the statute, on the defendant's motion peremptorily instructed the jury to acquit him. On appeal we held that the statute did not embrace the offense of permitting the game of craps or oontz to be played on the premises. In the opinion it is said:

"The averments of the indictment, and the evidence offered in support of it, present the question: When a game of oontz is played with dice on a table or other surface by betters, does it come within the meaning of the terms 'other machine or contrivance' used in the statute? In other words, what constitutes such 'other machine or contrivance?' This court, recognizing as it does the evil of gambling, and the legislative desire to suppress it, is far from being disposed to cramp the force of this statute. It must be remembered, however, that the punishment denounced by it is severe. The offender is made a felon. One should not be thus branded unless the law clearly makes him so. If it takes a doubtful construction to bring him within the statute, it should not be done. If the legislature really intended it to embrace such a party, it can, by additional legislation, make it plain. We turn then to precedent and rules for the construction of statutes for guidance. The statute first enumerates keno bank and a faro bank, contrivances which are used notoriously and solely for gaming. It then adds 'or other machine or contrivance used in betting.' It is a rule of construction that where a statute or any instrument enumerates certain things, and then uses a term which may be construed to include other things, it is generally to be confined to those of a like class or character. The term is to be restricted to those *ejusdem generis*. The general words following the particular ones must be construed as applying to things of the same general class. Here the statute first names certain machines or contrivances in well known use for gaming. Keno and faro are banking games. Keno banks and faro banks are contrivances for gaming in every sense of the word; so recognized and generally understood. This is not true of dice, which, while they may, and often are, used for gaming, as indeed almost anything can be, usually serve for amusement. Nor can

it be said that the table or floor, or whatever surface may be used, constitute the machine or contrivance within the meaning of the statute. Such things are not ordinarily used for gaming. Our law provides for the seizure and destruction of gaming implements, and this statute could not well be applied to the surfaces upon which this game might be played. As well might it be claimed that if persons gamed by the throwing of coppers upon an ordinary table or floor, that the money or table fell within the terms 'other machine or contrivance' used in the statute, and that the party suffering it to be done was liable to this severe penalty.    *    *    * The 'machine or contrivance referred to in the statute must, under the rule *ejusdem generis,* be one similar in character to a faro or keno bank.'" State v. Gilmore, 11 S. W. 620; Chapel v. State, 27 Tex. 310; Kansas v. Hardin, 1 Kan. 474; Ritte v. Commonwealth, 18 B. M. 35; Commonwealth v. Monarch, 6 Bush, 298.

In Kennedy v. Foster's Ex'r., 14 Bush 479, the question involved was whether the right of the payee to recover of a surety on a note was barred by the statute of limitations of seven years pleaded by the latter, in estoppel of which the payee pleaded that he had been obstructed in the bringing of the suit on the note within the seven years, by the surety's request for delay and his promise to pay the note without suit. The statute of limitations relied on by the surety provided that the limitation should not apply to "any delay assented to by the surety in writing," and it was the contention of the payee that the period of forbearance procured by the surety should be deducted in computing the period of limitation. This, however, was not allowed by the court, because the delay was not assented to by the surety in writing. It was insisted for the payee that the surety's assent in writing to the delay was not essential, as the statute also declares that "if such surety shall abscond, conceal himself or by removal from the state *or otherwise,* obstruct or hinder his being sued, the time of such obstruction shall not be computed as part of the time of limitation," and that though the surety did not consent in writing to the delay, he did *otherwise,* that is, by his request for indulgence and promise to pay the debt, obstruct or hinder his being sued within the seven years. In the opinion it is said:

"The words 'defeat or obstruct,' as used in the act, signify the performance of some act on the part of the

sureties, which will amount to a prevention or hindrance of a suit in opposition to the will and the rights of the creditor, such as can not with reasonable diligence be overcome. The terms import resistance and obstruction to his rights, and unless the acts complained of are, in point of fact, such as would hinder and prevent him from bringing the suit, notwithstanding his desire to do so, they cannot properly be said to 'defeat or obstruct' such suit.

"This is in accordance with a well-settled rule of construction. When certain things are enumerated, and then a phrase or word is used which includes other things, but does not specify what other things were intended, such phrase or word will generally be confined to things of the same kind as those enumerated: (5 Term Reports, 375, 379; 1 Barn. & C. 237; 5 id. 640; 3 Randolph 191). The acts specially designated as sufficient to deprive the surety of the right to compute the time of their continuance as part of the period of limitation, are all of them such as obstruct or hinder the institution of the suit, although the creditor may desire to sue, and hence the phrase 'or otherwise obstruct or hinder' must be construed to refer to obstructions or hindrances of a kind similar in character or having a similar effect as those specified. A request to forbear, or a promise to pay the debt at a future time, cannot in any just sense be said to either obstruct or hinder the bringing of an action. The failure to sue in such a case is the voluntary act of the creditor. He is left free to act as he may prefer, may sue if he will, and cannot, by any fair or reasonable interpretation, be said to be either obstructed or hindered. * * * Any other construction leaves open a broad field for litigation and perjury, which the provision, that indulgence assented to in writing should be excluded from the period of limitation, shows the legislature appreciated and intended to close."

Assuming that our construction of section 1159, Kentucky Statutes, correctly expresses its meaning, the conclusion is inevitable that the indictment against appellant fails to state a public offense, hence his demurrer thereto should have been sustained and the error committed by the trial court in overruling it compels the reversal of the judgment. It is unnecessary to consider the objection of appellant that the evidence fails to establish his guilt; or his complaint of the failure of the

trial court to peremptorily instruct the jury to acquit him, further than to say the evidence was scant, but even if it were stronger in support of the facts alleged in the indictment than we find it to be, as the facts therein alleged do not manifest a public offense, necessarily the evidence cannot be said to do so. Therefore, the giving of the peremptory instruction would have been proper.

For the reasons indicated the judgment is reversed and cause remanded, with directions to the circuit court to grant appellant a new trial, sustain his demurrer to the indictment, and for such further proceedings as may conform to the opinion.